**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PAUL ARGEN and SURENDER MALHAN, <br><br> Plaintiffs, <br><br> v. <br><br> DAVID KATZ, <br><br> Defendant. | Civil Action No: 18-963(SDW)(LDW) <br><br> **OPINION** <br><br><br> June 5, 2023 |

**WIGENTON**, District Judge.

Before this Court are the parties' cross-motions for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56.  Jurisdiction is proper pursuant to 28 U.S.C. § 1331.  Venue is proper pursuant to 28 U.S.C. § 1391.  This opinion is issued without oral argument pursuant to Rule 78.  For the reasons stated herein, Defendant's motion for summary judgment, (D.E. 115), is **GRANTED** and Plaintiffs' motion for summary judgment, (D.E. 110), is **DENIED**.

I. **BACKGROUND AND PROCEDURAL HISTORY**

As the parties are familiar with the facts and procedural history of this dispute, this Court addresses only those facts necessary for the resolution of the instant motions.  Since 2011, Plaintiff Surender Malhan ("Malhan") has been engaged in contentious divorce/custody proceedings with his wife, Alina Myronova ("Myronova"), which have spawned extensive litigation in both state

and federal courts.[1]  As part of those proceedings, on June 18, 2015, New Jersey Superior Court Judge Donald A. Kessler ("Judge Kessler") entered a gag order ("Gag Order") precluding the parties from "speaking with, appearing for an interview, or otherwise discussing any custody information to any reporters, journalists, newscasters or other news media employees or from posting any blogs or information not previously posted or disseminated relating to the children or any custody issue in this case pending further hearing." (D.E. 115-3 Ex. B.)[2]  When entering the Gag Order, Judge Kessler noted that he had considered the interest of the parties, including Malhan's First Amendment rights, as well as "the best interest of the [two minor] children." (D.E. 110-17 at 7–8, 29.)  In the following years, Judge Kessler, Defendant Judge David Katz ("Judge Katz"), to whom the case was later transferred,[3] and Judge Terry P. Bottinelli ("Judge Bottinelli) continued to enforce the Gag Order, noting numerous times that it was necessary to protect the best interests of Malhan's minor children. (*See, e.g.*, D.E. 115-3 Ex. D, Ex. E, Ex. F, Ex. H, Ex. I, Ex. J.)

Trial proceedings eventually began before Judge Katz. (D.E. 112 at 16; D.E. 121-3 at 4.)  During the trial, Dr. Paul Dasher testified about whether publicity could negatively impact the children, and said that although he had not seen "adverse impact" to the children from publicity as

---

[1] There have been more than twenty-seven actions related to the divorce and custody proceedings, with some still pending in various courts. (*See* D.E. 115-3 at 143–44; s*ee also e.g.*, *Fam. Civ. Liberties Union v. New Jersey*, 837 F. App'x 864 (3d Cir. 2020); *Malhan v. Katz*, 830 F. App'x 369 (3d Cir. 2020); *Malhan v. Sec'y U.S. Dep't of State*, 938 F.3d 453 (3d Cir. 2019); *Allen v. Debello*, 861 F.3d 433 (3d Cir. 2017); *Edelglass v. New Jersey*, No. 14-760, 2015 WL 225810 (D.N.J. Jan. 16, 2015); *Malhan v. Katz*, No. 20-8955.)

[2] Citations to "D.E." refer to the docket entries for the parties' motion papers, including briefs, affidavits, declarations, and statements of undisputed facts, and the documents attached to and referenced therein. For continuity, the page numbers cited throughout this Opinion refer to the D.E. page numbers, not to the documents' original page numbers.

[3] Judge David Katz, who is the sole remaining named defendant in this matter, handled the case until it was transferred to Bergen County Superior Court. (D.E. 115-2 ¶ 6; D.E. 119-1 ¶ 6.)  Because the case has been transferred to different judges for adjudication, this Court will refer to Defendant as "State court" throughout this opinion.

of 2019, if the children were exposed to publicity, "they would be embarrassed . . . if it came to the attention of their peers," and "it would be harmful" in that context." (D.E. 110-37 at 6.) However, he did not think that "reading anything on their own would be problematic per se," because he did not "get the impression that they were actively seeking that information on line [sic]." (D.E. 110-37 at 6–7.) Part of the way through trial, the matter was assigned to another Judge. (D.E. 112 at 16; D.E. 121-3 at 4.) On April 6, 2021, the New Jersey Supreme Court directed that the "trial commence anew" and provided "procedural terms to govern future proceedings." (D.E. 115-3 Ex. B.) The trial-level proceedings thereafter recommenced, and Judge Bottinelli issued a 336-page judgment of divorce opinion on February 25, 2022, within which the court upheld the Gag Order after finding that the purpose of the gag order was "to protect the privacy of the children," which is "paramount to the minor limitations [that] could impact on [Malhan's] First Amendment rights." (*Id.*) The Court "weighed the best interests of the parties' children against [Malhan's] First Amendment rights and his desire to publish information about the children in relation to the custody and parenting time litigation against his First Amendment rights," and found that the "rather limited interference with [Malhan's] rights pales in comparison to the lifelong scars that could be suffered by the children should the [Gag Order] be lifted." (*Id.*)

On January 23, 2018, Malhan and Paul Argen ("Argen"), (collectively, "Plaintiffs") filed suit in this Court challenging the constitutionality of the Gag Order pursuant to 42 U.S.C. § 1983 and the Declaratory Judgment Act, 28 U.S.C. § 2201, and seeking to enjoin enforcement of the Gag Order. (D.E. 1 ¶ 1.) Argen's connection to this case is purportedly as a member of the media, an "investigative journalist," and an "advocate." (D.E. 110-3 at 1, 3.) On April 2, 2021, Plaintiffs moved for partial summary judgment, and Defendants[4] cross-moved. (D.E. 86-1; D.E. 89-1, 90-

---

[4] At this time, there were two Defendants: Judge Katz and the Attorney General for the State of New Jersey.

1.) On July 8, 2021, this Court granted in part Defendants' Motion and dismissed as moot in part Plaintiffs' motion. (D.E. 93; D.E. 94.) On July 22, 2021, Plaintiffs filed a Motion for Reconsideration, which this Court denied on August 5, 2021. (D.E. 95; D.E. 97.)

On August 20, 2021, Plaintiffs appealed. (D.E. 99.) On August 16, 2022, the Third Circuit affirmed "dismissal of Malhan's claim as precluded under the doctrine of *res judicata*," affirmed this Court's dismissal of the Attorney General from the litigation, vacated dismissal of Argen's claim and remanded the matter for this Court to consider and "evaluate Argen's First Amendment claim on its merits." (D.E. 101; *Argen and Malhan v. Att'y Gen. N.J. and Katz*, No. 21-2571, 2022 WL 3369109, at *1, *3, *6 (3d Cir. Aug. 16, 2022).) The parties thereafter resubmitted timely briefing on the instant Motions. (*See* D.E. 110; D.E. 112; D.E. 115; D.E. 119; D.E. 120; D.E. 121; D.E. 122; D.E. 123.)

## II.  LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986) (emphases in original). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing FED. R. CIV. P. 56(e)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not "to weigh the evidence and determine the truth of the matter[,] but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence

5

submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002) (citing *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998)).

### III. DISCUSSION

The First Amendment of the Constitution provides that "Congress shall make no law . . . abridging the freedom of speech, or of the press." U.S. CONST. AMEND. I. The United States Supreme Court has acknowledged "a First Amendment right to 'receive information and ideas,' and that freedom of speech 'necessarily protects the right to receive.'" *Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976) (quoting *Kleindienst v. Mandel*, 408 U.S. 753, 762–63 (1972)). The First Amendment also protects "the media's right to gather news." *PG Publ. Co. v. Aichele*, 705 F.3d 91, 99 n.9 (3d Cir. 2013). Generally, "only a compelling [governmental] interest in the regulation of a subject within [governmental] constitutional power to regulate can justify limiting First Amendment freedoms." *Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965) (quoting *NAACP v. Button*, 371 U.S. 415, 438)).

The sole legal issue this Court must address in the instant matter is whether the 2015 Gag Order violates Argen's First Amendment rights—not whether the 2015 Gag Order was valid as it pertains to Malhan. The latter issue has been put to rest and cannot be revisited. The arguments raised in Argen's briefs to this Court, however, heavily focus on rehashing and revisiting the validity of the 2015 Gag Order as it pertains to Malhan, which this Court declines to address. This Court will "not make credibility determinations or engage in any weighing of the evidence," *Marino*, 358 F.3d at 247, but will instead weigh the competing interests of the parties as it considers whether the 2015 Gag Order impermissibly infringes upon Argen's First Amendment "right to listen," as the Third Circuit directed in its mandate to this Court, *Argen*, 2022 WL 3369109 at *2.

6

To analyze whether Argen's First Amendment right has been infringed, and appropriately "weigh the relevant interests," *id.* at *6, this Court must first discuss the level of scrutiny required for the analysis. Notably, "[t]he Third Circuit is silent on whether a gag order imposed on a trial participant can operate as a prior restraint on the press," and, moreover, "[o]ther Circuits that have addressed the issue are in disagreement." *Nichols v. Sivilli*, No. 2:14–3821, 2014 WL 7332020, at *5 (D.N.J. Dec. 19, 2014) (citing and comparing In re Dow Jones & Co., Inc. (*Dow Jones & Co.*), 842 F.2d 603 (2d Cir.1988) (gag order on trial participant does not operate as a prior restraint on the press); *Radio and Television News Assoc. of S. Cal.*, 781 F.2d 1443 (9th Cir.1986) (same); *J. Publ'g Co., v. E.L. Mechem*, 801 F.2d 1233 (10th Cir.1986) (gag order on trial participant is a prior restraint on the press presumed to be constitutionally invalid); and *CBS Inc. v. Young*, 522 F.2d 234 (6th Cir.1975) (same)).

Plaintiffs' argument focuses primarily on the prior restraint of Malhan's speech rather than the restriction on Argen's right to listen, and contends that this Court must apply strict scrutiny when examining the restriction on either Malhan's speech or Argen's right to listen. (D.E. 112 at 22–32 (citing *United States v. Alvarez*, 567 U.S. 709, 718 (2012)); D.E. 119 at 13–17 (citing *Nichols*, 2014 WL 7332020); *Globe Newspaper Co. v. Superior Ct. for Norfolk Cnty.*, 457 U.S. 596 (1982)).) Plaintiffs' reliance on *Alvarez* is not on point because that matter solely concerns restrictions on speech, rather than restrictions on listening, as in the present matter. *See Alvarez*, 567 U.S. at 716–17. Of note, the Court required "exacting scrutiny" when examining the issue, which pertained to the speaker, not the listener. *Id.* Plaintiffs' reliance on *Nichols* is also misplaced because a parallel Court declined to examine the scrutiny required to examine the impact of a gag order on the First Amendment rights of a listener. *See Nichols*, 2014 WL 7332020 at 5–6.

7

Plaintiffs' reliance on *Globe Newspaper* comes close to assisting with deciphering the level of scrutiny required, yet still does not quite hit the mark.

In *Globe Newspaper*, the Court examined Massachusetts' mandatory rule barring press and public access to criminal sex-offense trials during the testimony of minor victims and noted that "the circumstances under which the press and public can be barred from a criminal trial are limited; the State's justification in denying access must be a weighty one." *Id.* at 606–07.  The Court determined that when "the State attempts to deny the right of access in order to inhibit the disclosure of sensitive information, it must be shown that the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Id.* at 606–07.  The Court applied the requisite level of scrutiny and ultimately found that "a mandatory rule, requiring no particularized determinations in individual cases, is unconstitutional." *Id.* at 610–11, n.27.  The decision in *Globe Newspaper*, however, is distinguishable from the present matter in that here, there has been a particularized determination on an individual case, as the Gag Order pertains to one case alone, and it has been narrowly tailored to limit the speech of only persons intimate to the matter, in an effort to serve the best interests of the children and avoid adverse impact, embarrassment, and harm that could be caused by inadvertent or intentional airing of parental or marital grievances in a public forum.  (*See* D.E. 110-37 at 6.)  Thus, *Globe Newspaper* is of limited assistance in determining the level of scrutiny required here.

Regarding a determination of the level of scrutiny required, Defendant argues that strict scrutiny would be the standard for examining Malhan's First Amendment claim, but notes that such a claim is not at issue here.  (D.E. 121-1 at 24).  Because the Gag Order does not apply to Argen, he is not directly subject to its restrictions and cannot be liable for violation of it, Defendant contends that this Court should apply a "reasonableness" standard when examining whether the

8

Gag Order violates Argen's First Amendment rights. (*Id.* (citing *In re Application of Dow Jones & Co.*, 842 F.2d 603, 610 (2d Cir. 1988) (requiring review of a gag order challenged by the press— a gag order on another person, not the press—to be reviewed under a reasonableness standard); *Radio & Television News Assoc.*, 781 F.2d at 1446–47 (same)). For this reason, Defendant argues, the Gag Order is considerably less intrusive of First Amendment rights than one directly aimed at the press. (*Id.*) Defendant points out, however, that even if applying strict scrutiny, the Gag Order is constitutional because "courts can—in appropriate circumstances—approve of prior restraints on speech, so long as a sufficiently important interest justifies the restriction, which includes a right of privacy (surely one of the Malhan children's interests at issue here)." (D.E. 121-1 at 26 (citing *Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419–20 (1971)).

  Although the Third Circuit has not previously considered this discreet issue, the Court has generally noted that a statute that contains a "[c]ontent-based prohibition of . . . expression is 'presumptively invalid.'" *Stilp v. Contino*, 613 F.3d 405, 409 (3d. Cir. 2010) (quoting *United States v. Stevens*, 130 S. Ct. 1577, 1584, 176 L. Ed. 2d 435 (2010)). When examining a statutory restriction on speech, courts must determine whether the statute at issue "(1) serve[s] a compelling governmental interest; (2) [is] narrowly tailored to achieve that interest; and (3) [is] the least restrictive means of advancing that interest." *Id.* (quoting *ACLU v. Mukasey*, 534 F.3d 181, 190 (3d Cir. 2008). In the Third Circuit's recent decision concerning this case, the Court "note[d] that in some circumstances, 'privacy rights may outweigh the public's interest in disclosure' of the information sought by a plaintiff claiming a First Amendment right of access," *Argen*, 2022 WL 3369109 at *6 (quoting *United States v. Smith*, 776 F.2d 1104, 113 (3d Cir. 1985)), and further "observe[d] that the New Jersey Supreme Court has articulated several factors for the 'weighing process' between the 'public's right' to information about a family court proceeding and the

'state's compelling interest in conducting a private hearing,' . . . ," *id.* (quoting *N.J. Div. of Youth & Fam. Servs. v. J.B.*, 576 A.2d 261, 269–70 (N.J. 1990)).

In *J.B.*, the Court examined "whether closure to the public of certain custody cases involving the Division of Youth and Family Services . . . is mandated by Court Rules or statute" and found that, on a case-by-case basis, "[t]he compelling state interest in protecting victims of child abuse from the embarrassment of testifying in an open courtroom, with the attendant possibility of media coverage, justifies a presumption that DYFS proceedings initiated under Title 30 or Title 9 will be closed to the public." *J.B.*, 576 A.2d at 263–70. When a court considers "the [S]tate's interest in privacy against the public's interest in access," the Court found that "in cases involving the State's compelling interest in safeguarding the physical and psychological well-being of minors, trial courts should weigh a variety of factors relating to the actual effect of open proceedings on the particular child," including the following: (1) "the nature of the allegation underlying the DYFS complaint," (2) "any allegation of physical or psychological abuse or of serious neglect," (3) "age and maturity of the child," (4) "special pressures" attendant upon "[c]hildren who must face their peers in school," and (5) "[t]he possibility that a child might be adversely affected by future revelation of embarrassing facts." *Id.* at 269–70. Because the issue in the present matter does not fit squarely into the restriction of speech analysis in *Globe* or the content-based prohibition in *Stilp*, this Court looks to the standard that the Third Circuit set forth—the New Jersey Supreme Court "weighing process"—and weighs the State court's compelling interest in protecting Malhan's children against Argen's right to listen to the information Malhan seeks to share with him—and, by extension, with the general public.

Applying the *J.B.* weighing process here, this Court finds that the State has a compelling interest in protecting Malhan's children from unnecessary embarrassment, peer and societal

10

pressures, and psychological harm and adverse impact that may stem from publication of details relevant to the custody battle their parents have been engaged in, which—despite the matter being resolved at the State level—appears to continue as remaining cases or appeals pertaining to the divorce proceedings or Gag Order[5] wind their way through various courts, including this one.

Regarding the first *J.B.* factor, this Court notes that the nature of the information Malhan wishes to share with Argen includes sensitive details of family court proceedings and allegations concerning his divorce and child custody travails—information and allegations that Dr. Dasher noted could embarrass and psychologically harm the children if made publicly available. (*See* D.E. 110-37 at 6.) This factor weighs in favor of protecting the children with limited comparative infringement on Argen's rights.

As for the second *J.B.* factor, Malhan subjected the children to psychological abuse throughout the many years of divorce and child custody proceedings, and the Gag Order was specifically designed to "protect the best interests of Malhan's minor children" and prevent additional embarrassment and harm to them. (*See* D.E. 115-3 Ex. B, Ex. I.) Malhan admits to having "long been an active 'blogger' and for years," who has published many sensitive postings about his marriage and divorce, including discussing "how his putative wife had committed fraud and stolen over $300,000 from marital assets and his business," "describing the scam perpetrated on him by his putative wife," writing about "'kids for cash, custody for cash,' crime, corruption, abuse of power in family courts," and putting forth various other vitriolic accusations and observations about his perception of his ex-wife and the State court. (D.E. 110-2 ¶¶ 20–21, 63–64, 241, 250–79.) In fact, "[s]ince 2012 Malhan has posted about 80 Facebook posts discussing [the] situation with his litigation and the family courts." (*Id.* ¶ 236.) The State court found that

---

[5] *See, e.g.*, *Malhan v. State of N.J., et al.*, 22-cv-06353.

during years of contentious litigation, Malhan psychologically abused the children in various ways, and many of the abuses centered on the ongoing divorce and custody battle. (*See* D.E. 115-3 Ex. I.) For example, Malhan forced the children to make videotapes that were disparaging of their mother and posted the videos on social media; wrote scripts for his children, which were designed to disparage their mother; coached the children on how to discuss issues with psychologists or investigators; wrote letters in the children's names in which he disparaged their mother; told his children that their "mother was evil, a liar, a thief, and a manipulator"; "badgered the children" into answering questions about their mother, her family members, and court proceedings; and ignored his children's pleas to stop the inquisitions, coaching, and badgering, among many other abusive infractions. (*Id.* Ex. I at 285–86, 291–96.) In its exhaustive opinion, the State court discussed myriad examples of psychological abuse Malhan inflicted on his children—primarily stemming from the divorce and custody proceedings—and found that Malhan "subjected the children to psychological maltreatment." (*Id.* Ex. I at 289.) Of note, there is no evidence of physical abuse of the children by Malhan. (D.E. 110-2 ¶ 162.) This Court weighs the psychological abuse and finds that the Gag Order protects the children's privacy and serves their best interests, and, in turn, outweighs Argen's right to listen to the information Malhan wishes to share concerning the divorce and custody proceedings.[6]

The third, fourth, and fifth *J.B.* factors go hand-in-hand, in this case. One of Malhan's minor children is presently seventeen years of age, and the other is thirteen years of age. As Dr. Dasher testified, although during the early years after the Gag Order was imposed, the children had not yet experienced "adverse affects by any publicity in th[e] case," the children getting older

---

[6]This Court further notes that the Gag Order appears to have thus far somewhat successfully shielded the children from the publication of copious amounts of sensitive, personal details about the divorce and custody proceedings that would likely harm the children should they or their peers discover such information. (*See* D.E. 119 ¶ 91.)

12

would increase the likelihood of harmful exposure to such publicity." (D.E. 110-37 at 6.) That the risk of embarrassment from exposure has certainly not diminished as the children age; conversely, as the children get older the risk of peers finding untoward information is ever present, and, as Dr. Dasher noted, "would clearly not be in the children's best interests." (*Id.*) These children are of ages in which their peers are active online and on social media and could easily learn damaging and embarrassing information about their parents' acrimonious proceedings, absent the Gag Order. The prolific, vitriolic nature of Malhan's blog postings convincingly show the need to protect the children from such public admissions and accusations concerning them, their mother, and their family. (*See, e.g.*, D.E. 115-3 Ex. G (describing the children as victims who have been kidnapped by a Judge and others involved in the child custody case—persons he describes as "child predators," "kidnappers," and "terrorists," *inter alia*, and accusing their mother of scamming him and being greedy.) The potential for the children, who have already been traumatized by Malhan's behavior, to experience extreme embarrassment, additional abuse, and/or psychological harm does not lessen as they age. This Court finds, therefore, that the interest of protecting the children's privacy rights outweighs Argen's right to listen.

When this Court weighs the potential of harm to the children and considers their best interests, it finds that any infringement on Argen's right to listen is negligible in comparison to the harm that published revelations from Malhan would pose, and therefore the Gag Order does not impermissibly violate any right Argen has to listen. In fact, Argen's rights are minimally impacted because he is not directly addressed in the Gag Order and is free to write what he would like to write concerning this or any other matter to which he is not directly subject to the restrictions of such an order.

Contrary to Plaintiffs' protests that the Gag Order is not narrowly tailored and not the least restrictive means of accomplishing the goal of the Order, this Court finds that Defendant has sufficiently demonstrated that the Gag Order is as narrowly tailored as possible in this particular case, given it is directed toward only the applicable parties to the custody matter, and, moreover, given the overwhelming need to curtail Malhan's penchant for prolific publication and continuing desire to expose intimate, personal, and potentially embarrassing information related to the children and their mother and family.

In sum, whether analyzing Argen's right to listen under the more lenient reasonableness standard or under a strict scrutiny standard with a weighing process, as this Court has done, it is evident to this Court that the State court's interest in protecting Malhan's children from the harmful effects of publicity stemming from this contentious, long-fought custody battle abundantly eclipses any interest Argen may have in listening to Malhan's revelations.  Moreover, Argen is not prohibited from printing information concerning this matter; the restriction rests on Malhan's shoulders, multiple courts have affirmed the need for the restriction, and Malhan's continuing conduct has further confirmed for this Court that the 2015 Gag Order was not only necessary, but also wise.

The State court has a compelling interest in protecting children from harm, and the court has done just that here by issuing the Gag Order.  This Court, therefore, finds that any restriction on Argen's ability to listen that stems from Malhan abiding by the Gag Order is reasonable when weighed against the court's compelling interest in protecting the best interests of Malhan's children and safeguarding their psychological wellbeing, as well as the court's compelling interest in protecting the children's privacy.  Consequently, Defendant's Motion for Summary Judgment shall be granted, and Plaintiffs' Motion for Summary Judgment shall be denied.

## IV. CONCLUSION

For the reasons set forth above Defendant's motion for summary judgment is hereby **GRANTED**. Plaintiffs' motion for summary judgment is hereby **DENIED**. An appropriate order follows.

                                                /s/ Susan D. Wigenton
                                         **SUSAN D. WIGENTON, U.S.D.J.**

Orig: Clerk
cc:    Leda D. Wettre, U.S.M.J.
       Parties